IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT CINCINNATI

| | |
|---|---|
| WEST HILLS HOSPITAL; LOS ROBLES REGIONAL MEDICAL CENTER d/b/a LOS ROBLES HOSPITAL AND MEDICAL CENTER; and GREENVIEW HOSPITAL, INC. d/b/a GREENVIEW REGIONAL HOSPITAL, | No. ____1:25-cv-618_____ |
| Plaintiffs, | |
| v. | ORIGINAL COMPLAINT DEMAND FOR JURY TRIAL |
| COMMUNITY INSURANCE COMPANY d/b/a ANTHEM BLUE CROSS AND BLUE SHIELD, | |
| Defendant. | |

Plaintiffs, West Hills Hospital; Los Robles Regional Medical Center d/b/a Los Robles Hospital and Medical Center; and Greenview Hospital, Inc. d/b/a Greenview Regional Hospital (collectively, "Plaintiffs" or "Hospitals") submit the following Complaint against Defendant, Community Insurance Company d/b/a Anthem Blue Cross and Blue Shield ("Defendant" or "Anthem OH").

### STATEMENT OF FACTS

### A.    PARTIES

1.    West Hills Hospital ("West Hills")[1] is a California corporation with its principal place of business in Davidson County, Tennessee. West Hills is a citizen of California and Tennessee.

---

[1] Certain assets of the legal entity West Hills Hospital were sold to UCLA Health, effective as of March 29, 2024. What was previously known as West Hills Hospital and Medical Center is now operated by UCLA under the name UCLA West Valley Medical Center. The legal entity West Hills Hospital was retained by HCA Healthcare, along with certain assets, including accounts receivable for medical services provided prior to the sale, which includes a medical claim at issue in this Complaint.

2.      Los Robles Regional Medical Center d/b/a Los Robles Hospital and Medical Center ("Los Robles") is a California corporation with its principal place of business in Davidson County, Tennessee. Los Robles is a citizen of California and Tennessee.

3.      Greenview Hospital, Inc. d/b/a TriStar Greenview Regional Hospital ("Greenview") is a Kentucky corporation with its principal place of business in Davidson County, Tennessee. Greenview is a citizen of Kentucky and Tennessee, and the hospital is located in Kentucky.

4.      Community Insurance Company d/b/a Anthem Blue Cross and Blue Shield, is an Ohio corporation doing business in Ohio, as well as other states. Anthem OH is a citizen of Ohio. Anthem OH maintains a principal place of business in Ohio and may be served through its registered agent, CT Corporation, at 4400 Easton Commons Way, Suite 125, Columbus, Ohio 43219.

## B.     JURISDICTION AND VENUE

5.      This Court has personal jurisdiction over Defendant because Defendant is domiciled in Ohio and conducts business in Ohio.

6.      This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332 because this dispute is between completely diverse parties and involves an amount in controversy that is greater than $75,000. This Court also has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs assert a claim under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001, *et seq.*, ("ERISA") that arises under the laws of the United States. Further, this Court may exercise supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

7.      Venue is proper in the Southern District of Ohio pursuant to 28 U.S.C. § 1391(b)(1)

because Defendant is domiciled in Ohio and maintains its principal place of business in the Southern District of Ohio.

### C. FACTUAL BACKGROUND

### I. THE AGREEMENTS AND THE BLUECARD PROGRAM

8. Plaintiffs are acute care hospital systems in California and Kentucky. Plaintiffs provide medically necessary services to their local communities.

9. As part of their provision of medically necessary services, Plaintiffs contract with local Blue Cross and Blue Shield ("BCBS") plans through several agreements. Specifically:

  i. West Hills and Los Robles, by and through their disclosed agent, Far West Division, Inc., contracted with Blue Cross of California d/b/a Anthem Blue Cross ("Anthem CA") under the Anthem Blue Cross Facility Agreement (eff. Oct. 1, 2017) (as amended, the "Anthem CA Agreement");

  ii. Greenview contracted with Southeastern Group, Inc. d/b/a Anthem Health Plans and Southeastern United Medigroup, Inc. d/b/a Anthem Blue Cross and Blue Shield ("Anthem KY") under the Anthem Blue Cross and Blue Shield Hospital Agreement (eff. May 1, 1998) (as amended, the "Anthem KY Agreement", and together with the Anthem CA Agreement, the "Agreements"[2]).

10. The Agreements specify the terms and conditions under which Plaintiffs will treat patients with BCBS health plans and/or insurance coverage, referred to herein as "subscribers,"[3] and be reimbursed for that treatment. Under the Agreements, Plaintiffs are entitled to payment at

---

[2] The Agreements contain confidentiality provisions. Accordingly, in effort to preserve confidentiality, Plaintiffs do not quote or attach them to this Complaint. The Agreements will be produced pursuant to a valid discovery request once a protective order has been entered and they will be filed with the Court under appropriate measures to protect confidentiality, as necessary.

[3] When used generally herein, the term "subscribers" is not capitalized. When the term is used to refer to the specific patients at issue in this dispute, the defined terms "Subscribers" or "Patients" are used.

specified, discounted rates when they provide medically necessary services to a subscriber.

11.     The Agreements are far broader than the relationship among only Plaintiffs Anthem CA and Anthem KY. The Agreements also cover services that Plaintiffs provide through the "BlueCard Program" to any subscriber enrolled in any BCBS health plan, including subscribers who are insured by another Blue Cross Blue Shield Association ("BCBSA") licensee in a different BCBS "service area."

12.     Anthem OH is the BCBSA licensee for the Ohio service area, and when the patients at issue in this dispute who have health coverage insured and/or administered by Anthem OH (the "Subscribers" or "Patients") received healthcare services at the Hospitals in California and Kentucky, the claims for payment associated with such care were properly submitted to the local BCBSA licensee for the respective state—Anthem CA for California and Anthem KY for Kentucky (collectively, the "Local Plans")—for processing in accordance with the terms of their Agreements with the Hospitals.

13.     Each of the Agreements expressly contemplate that Anthem OH is obligated to pay the rates set forth in the Agreements for the services provided to the Patients. Specifically, Anthem OH is bound by the Agreements in multiple ways: (i) as an "Affiliate" of the BCBSA; (ii) as an "Other Payer" under the Anthem CA Agreement; and (iii) by its participation in the "Blue Cross Blue Shield Out of Area Program," or "BlueCard Program," which is explained in more detail below.

14.     The Agreements provide that (i) Plaintiffs will provide services to subscribers of out-of-state BCBS plans through the BlueCard Program; (ii) such out-of-state BCBS plans, as "Affiliates" of the BCBSA, and/or as "Other Payors" under the Agreements, will access the discounted rates set forth in the Agreements when Plaintiffs provide services to their subscribers

through the Blue Cross Blue Shield Out of Area Program or BlueCard Program; and (iii) the out-of-state plans, as "Affiliates" of the BCBSA, and/or as "Other Payors" under the Agreements, will be bound by the terms and obligations of the Agreements when Plaintiffs provide services to their subscribers through the Blue Cross Blue Shield Out of Area Program or BlueCard Program, which includes the obligation to pay claims in accordance with the Agreements.

15. The Agreements expressly list Anthem OH as an "Affiliate" that is subject to the terms of the Agreements.[4]

16. The Anthem CA Agreement provides that an "Affiliate" of the BCBSA may access the terms of the Agreements, including the Hospitals' services and the reimbursement rates set forth therein. Similarly, the Anthem KY Agreement provides that "Affiliates" are subject to the terms of the Agreement.

17. When an "Affiliate" accesses the Hospitals' services and the reimbursement rates set forth in the Agreements, the "Affiliate" becomes a "Plan" responsible for paying for the services rendered by the Hospitals to the subscribers of the "Affiliate" at the rates set forth in the Agreements.

18. Furthermore, the Agreements specifically contemplate Anthem CA and Anthem KY assigning their rights and duties under the Anthem CA Agreement and Anthem KY Agreement to their "Affiliates" or designees, which includes Anthem OH.

19. Under the Anthem CA Agreement, Anthem OH also meets the definition of "Other Payor," as such definition expressly includes "Affiliates" and other BCBS plans that access the

---

[4] *See All Provider Agreement Affiliates List*, Anthem (last visited Aug. 21, 2025), https://www.anthem.com/content/dam/digital/docs/provider/commercial/guides/ALL_Affiliates_0001.pdf; *California Provider Agreement Affiliates List*, Anthem (last visited Aug. 21, 2025), https://www.anthem.com/content/dam/digital/docs/anthembluecross/provider/commercial/forms/ALL_Affiliates_CA.pdf. Printouts of Anthem's All Provider Agreement Affiliates List and California Provider Agreement Affiliates Lists are attached hereto as <u>Collective Exhibit 1</u>.

Local Plans' Agreements with the Hospitals.

20.     The Anthem CA Agreement provides that when "Other Payors" access the Hospitals' services and rates, the "Other Payors," like "Affiliates," become responsible as a "Plan" for paying the Hospitals for services provided to their subscribers at the rates set forth in the Agreements.

21.     Accordingly, under the Agreements, Anthem OH is required to pay the Hospitals for the services provided to the Patients at the rates set forth in the Agreements.

22.     Plaintiffs' expectations of reimbursement by Anthem OH at the rates specified in the Agreements were reinforced by Anthem OH's own conduct and representations, which are consistent with, if not express admissions of, Anthem OH being bound by the Agreements as an "Affiliate," an "Other Payor," and/or the "Plan" responsible for payment.

23.     Anthem OH represents on its website that the Hospitals are "in-network" with Anthem OH. Anthem OH includes a page on its website where its subscribers can locate care.[5] Using the "Find Care" tool on Anthem OH's website indicates that Anthem OH is "in-network" with the Hospitals for each of the Subscribers' health plans.[6]

24.     Anthem OH's website explains the difference between "in-network" and "out of network" as follows: "Doctors, hospitals, . . . may have a contract with us. If they do, they're in our network - also called *in-network providers*. . . . If they don't have a contract with us, they're

---

[5] *See Individual & Family Health Insurance Plans in Ohio*, Anthem (last visited Aug. 21, 2025), https://www.anthem.com/oh/individual-and-family/health-insurance. A printout of the webpage is attached hereto as Exhibit 2.

[6] *See Find Care*, Anthem (last visited Aug. 21, 2025), https://www.anthem.com/find-care/. Samples of the search results using Anthem OH's "Find Care" tool showing the Hospitals as "in-network" for the Subscribers are attached hereto as Collective Exhibit 3.

outside of our network - or *out of network providers*."[7]

25.     Furthermore, in a provider manual published on Anthem OH's website (the "Provider Manual"), Anthem OH explains, "BlueCard is a national program that enables members of one BCBS Plan to obtain healthcare service benefits while traveling or living in another BCBS Plan's service area. The program links participating healthcare providers with the independent BCBS Plans across the United States and in more than 200 countries and territories worldwide through a single electronic network for claims processing and reimbursement."[8] Anthem OH further explains to providers that "[t]he [BlueCard] program lets you submit claims for patients from other BCBS Plans, domestic and international, to your local BCBS Plan. Your local BCBS Plan is your sole contact for claims payment, adjustments and issue resolution."[9]

26.     The service area's BCBS plan under which the subscriber is insured is referred to as the "Home Plan," and the local BCBS plan for the state in which the subscriber receives care is referred to as the "Host Plan."

27.     The Provider Manual also includes illustrations of how the BlueCard Program operates, which demonstrate that when a Home Plan's subscriber receives covered services in another state, the Home Plan "adjudicates the claim according to the member's benefits and the provider's arrangement with the [Host Plan]."[10]

28.     This means that the Home Plan must pay for the covered services provided to its

---

[7] *See Frequently Asked Questions (FAQ) in Ohio: Doctors – Hospitals – Facilities*, Anthem (last visited Aug. 21, 2025), https://www.anthem.com/oh/faqs#7 (emphasis in original). A printout of Anthem OH's Ohio FAQ page is attached hereto as Exhibit 4.

[8] *See OH BlueCard Provider Manual – 2022*, Anthem (last visited Aug. 21, 2025), https://www.anthem.com/content/dam/digital/docs/provider/commercial/manuals/PM_MO_OH_WI_00004.pdf. Relevant excerpts from the Provider Manual are attached hereto as Exhibit 5.

[9] *See id*.

[10] *See id*.

subscriber at the rates specified in the Host Plan's contract with the provider.[11]

29.     A representative exemplar illustration from the Provider Manual summarizing the BlueCard Program (using an Illinois Host Plan and Tennessee Home Plan) is below:



30.     The Host Plan serves as the administrator for the subscribers' health plans when it handles claims through the BlueCard Program,[12] which is evidenced by the Host Plan charging an administration fee to the Home Plan.[13]

31.     The Host Plan also, upon information and belief, charges an access fee to the Home Plan to access the rates in the Agreements.

32.     Upon information and belief, the Host Plan and Home Plan have a direct or indirect

---

[11] *See e.g., In re: Blue Cross Blue Shield Antitrust Litigation*, 308 F. Supp. 3d 1241, 1255 (N.D. Ala. 2018) ("Through the BlueCard program, the Plans have agreed that when a contracted provider treats a patient covered by a Home Plan . . . the Home Plan will reimburse the provider at a rate which equals (at a minimum) the levels received for providers under the provider's contract with its Host Plan.").

[12] *See Health Care Serv. Corp. v. Methodist Hosps. of Dallas*, 814 F.3d 242, 246 (5th Cir. 2016) (explaining that "[the Host Plan] acts as the administrator for . . . claims arising under the BlueCard program.").

[13] *See Blue Cross Blue Shield Antitrust*, 308 F. Supp. 3d at 1255 ("Under BlueCard Rules, an access fee may be charged in connection with processing BlueCard claims, but that fee can be, and is frequently, negotiated or waived.").

contractual relationship relating to their participation in the BlueCard Program (*i.e.*, the Home Plan and Host Plan may directly contract with one another to participate in the BlueCard Program, or participation in the BlueCard Program may be a term of the licensing agreements between BCBSA and all BCBSA licensees).[14]

33.    Through this combination of Agreements, the BlueCard Program essentially operates as a rental network (i.e., a business arrangement where one insurer pays another insurer to access their network of providers).

34.    The BlueCard Program was purportedly developed to address claims processing inefficiencies and problems within the BCBSA.[15] But the implementation of the BlueCard Program also resulted in increased subscriber enrollment for the BCBSA licensees because it allowed them to offer nationwide coverage to their subscribers.[16] It is the BCBSA's position that the BlueCard Program allows BCBSA licensees to receive certain procompetitive benefits.[17]

35.    Applying the mechanics of the BlueCard Program to the present dispute, the BlueCard Program should have operated as follows: Anthem OH is the Home Plan for the Subscribers. The Subscribers receive care at the Hospitals in California and Kentucky. The Hospitals submit their claims for reimbursement for the services provided to Anthem OH's

---

[14] *See id.* at 1254 ("Under BlueCard, Plans were required to make their local provider discounts available to all Blue Members, even if they lived in another Plan's service area.").

[15] *See id.* ("In 1992, the BlueCard program was developed to, at least in part, address inefficiencies in the cooperative methods employed by the Blue Plans, including the lack of a uniform process, dissatisfaction of providers with their receivables, and customer confusion.")

[16] *See id.* at 1255 (internal citations omitted) ("Following the adoption of BlueCard, Blue enrollment ceased declining and started increasing. BlueCard allowed the Blue Plans to provide subscribers a single point of contact like insureds enjoyed with the national insurers. BlueCard was another avenue that allowed the Plans to offer nationwide coverage.").

[17] *See id.* at 1274 (BCBSA argued that the BlueCard Program results in procompetitive benefits for BCBSA licensees, and such "claimed procompetitive benefits include: (1) access to high-quality insurance products with a local focus, broad provider networks, and competitive premiums; (2) access to a nationwide patient volume for health care providers; and (3) 'prompt payments, ease of claims processing[,] and lower administrative costs.'").

Subscribers to the Local Plans. Then, the Local Plans, acting as the administrators of the healthcare claims made under the Subscribers' health plans, review the claims, determine the amount that would be payable under the Agreements based on the services the Hospitals provided to the Subscribers, and forward the claims to Anthem OH for adjudication. Anthem OH, as the Home Plan, applies the Subscribers' health benefits, makes coverage determinations, and approves or denies payment for the services, at the rates set forth in the Agreements. The Local Plans then transmit the Home Plan's decisions and payments to the Hospitals.

36. Accordingly, and consistent with how the BlueCard Program operates, the Hospitals expected Anthem OH to reimburse them for the services provided to its Subscribers at the rates specified in the Agreements, which are the rates Anthem OH agreed to pay, by virtue of its participation in the BlueCard Program, and as an "Affiliate" and "Plan" under the Agreements, as well as an "Other Payor" under the Anthem CA Agreement.

37. Additionally, for at least some of the Subscribers at issue in this dispute, the Hospitals received correspondence or communications directly from Anthem OH, as opposed to the Local Plans, concerning the claims at issue.

38. Anthem OH's Subscribers received medical services from the Hospitals through the BlueCard Program, and accordingly, as an "Affiliate" of the BCBSA and the responsible "Plan" under the Agreements, and as an "Other Payor" responsible for the claims associated with such care under the Anthem CA Agreement, Anthem OH is contractually bound by the Agreements, including their provisions obligating Anthem OH to timely and correctly pay claims at the rates set forth therein.

39. Plaintiffs are authorized to assert the claims described herein on behalf of the Subscribers because upon admission to the Hospitals, each patient or his or her legal representative

signs a form, often referred to as Conditions of Admission ("COA"), that includes an assignment of the patient's health insurance benefits (including an assignment of rights to pursue those benefits in litigation or in any other forms of dispute resolution in any forum for any type of relief) to Plaintiffs.

40.     The Subscribers (or their legal representative) signed a COA assigning their rights and benefits under their respective health plan to Plaintiffs. Each COA contains the following provision or substantially similar language: "[p]atient assigns all his/her rights and benefits under existing polices of insurance providing coverage and payment for any and all expenses incurred as a result of services and treatment rendered by the Provider. . . . I hereby irrevocably appoint the Provider as my authorized representative to pursue any claims…. and administrative and/or legal remedies . . ."[18]

41.     Further, Plaintiffs' claims for reimbursement, which Anthem OH received through the Local Plans, each indicated on field 53 of the claim form (known as a "UB-04") that they were being submitted pursuant to an assignment of benefits.

## II.     FACTS CONCERNING THE CLAIMS AT ISSUE

### Patient 1, Admitted and Discharged in 2024

42.     At the time services were rendered, Patient 1 was a 49-year-old female with a history diabetes who presented to West Hills' emergency department with elevated glucose levels, nausea, vomiting, diarrhea, and a vesicular rash on her abdomen. Lab tests revealed that Patient 1 had an elevated white blood cell count, electrolyte imbalances, and metabolic acidosis. Patient 1 was admitted as an inpatient to West Hills' intensive care unit ("ICU") per physician order for

---

[18] Copies of the COAs signed by the Patients, which have been redacted to protect the Patients' identities in accordance with The Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), are attached hereto as Collective Exhibit 6. Unredacted copies of the Conditions of Admission have been previously provided to Anthem OH.

further management of diabetic ketoacidosis and shingles reactivation. At the time of admission, Patient 1 received an IV bolus and fluids, insulin drip, antiviral, antiemetics, and potassium replacement, as well as oral antiemetics. The following day, Patient 1 was moved to the medical/surgery floor and was evaluated by the infectious disease team, who recommended that Patient 1 remain on an antiviral IV until her discharge.

43.     During Patient 1's admission, her pain transitioned from her abdomen to her lumbar spine and sacrum. By inpatient day six, Patient 1's diabetic ketoacidosis had been resolved, and the vesicular rash appeared to be healed. Given her improvement, West Hills began to initiate discharge planning by inpatient day seven, but Patient 1 developed new constipation, back pain, and neuropathic pain, requiring additional medications and treatments, including enemas, IV narcotic analgesics, transdermal anesthetic, oral anticonvulsants, and tricyclic antidepressants. Once her lab results stabilized and her pain was controlled, Patient 1 was discharged home in stable condition after nine days of inpatient admission.

44.     Patient 1 presented to West Hills with insurance through Anthem OH. West Hills timely notified Anthem OH of Patient 1's inpatient admission within 24 hours of admission. By correspondence dated March 27, 2024, Anthem OH notified West Hills that authorization for Patient 1's admission was pending review. West Hills sent Patient 1's updated clinicals to Anthem OH by fax on March 28, 2024. By correspondence dated March 28, 2024, Anthem OH denied Patient 1's entire inpatient stay for purported lack of medical necessity. Then, by correspondence dated March 31, 2024, Anthem OH authorized the first five days of inpatient admission under authorization number UM58757359. West Hills timely submitted updated clinicals to Anthem OH on April 2, 2024, and on April 4, 2024. Per correspondence dated April 5, 2024, Anthem OH again

approved only the first four days of admission. Anthem OH denied the remaining four days as purportedly not medically necessary.

45.     On June 11, 2024, West Hills timely submitted its claim for the medically necessary services provided to Patient 1 to Anthem CA for forwarding to Anthem OH. By correspondence dated July 1, 2024, Anthem OH partially denied the claim for a purported lack of medical necessity and issued partial payment.

46.     On July 31, 2024, West Hills timely submitted its first-level appeal to Anthem CA for forwarding to Anthem OH, enclosed a copy of Patient 1's medical records, and requested a medical necessity review. By correspondence dated October 5, 2024, Anthem OH confirmed receipt of the first-level appeal on August 6, 2024, and upheld the denial for a purported lack of medical necessity.

47.     The denial of West Hills' claim for the medically necessary, covered services rendered to Patient 1 on the basis of a purported lack of medical necessity constituted a wrongful denial of benefits and should be reversed.

48.     First, there is no indication that Anthem OH performed a medical necessity review on appeal, as provided for in the Anthem CA Agreement, despite West Hills' request for same. Further, the services rendered were medically necessary as evidenced by Patient 1's medical records. Patient 1 was admitted as an inpatient per physician orders in the exercise of their professional medical judgment. Additionally, her continued inpatient stay was medically necessary for pain management and until her lab results reached stable levels for discharge.

49.     Further, at least some portion of the billed services constituted emergency and post-stabilization care services for which Anthem OH is required to pay under federal and state law. *See*

42 CFR § 438.114(b)-(e); Ohio Rev. Code Ann. §§ 1753.28(B)-(C); 3923.65(B); Cal. Health & Safety Code §§ 1371.4(b); 1317.2a(d).

50.     In sum, West Hills provided medically necessary, covered services to Patient 1 and is entitled to payment in full for those services. According to the terms of the Anthem CA Agreement, West Hills is entitled to be paid an additional $35,816.00 for the medically necessary, covered services it provided to Patient 1.

<u>Patient 2, Admitted and Discharged in 2019</u>

51.     At the time services were rendered, Patient 2 was a 58-year-old female who presented to Greenview for a scheduled outpatient transforaminal lumbar interbody fusion at L3-S1 with observation. Patient 2 had a history of degenerative disc disease, chronic low back pain, and right lower extremity pain, with severe L3-L4 disc degeneration accompanied by caudal and cranial extrusion. Patient 2 tolerated the procedure well, but due to an ongoing post-operative need for physical and occupational therapy, along with a recommendation for placement in a rehabilitation facility for continued care, her level of care changed to inpatient per physician orders. During this time, Greenview worked to secure placement for Patient 2. Once a facility was secured, Greenview submitted Patient 2's updated clinical records and physical therapy evaluation and requested that the rehabilitation facility initiate their request for authorization with Patient 2's insurance. Greenview continued to provide updated clinical records to the rehabilitation facility and followed up with the rehabilitation facility about the status of insurance authorization for the transfer. Three days later, once insurance approved placement at a rehabilitation facility, Patient 2 was discharged that same day to the rehabilitation facility for continued care.

52.     Prior to the procedure, Patient 2's provider requested authorization for Patient 2 to undergo a laminotomy with nerve root decompression, laminectomy, and laminotomy and

14

facetectomy as part of a spinal fusion surgery. Per correspondence dated April 29, 2019, Anthem OH denied pre-authorization for the spinal fusion portion of the procedure (CPT codes 22853, 22840, and 22842) due to purported lack of medical necessity but stated that if during the procedure, the physician deems the services denied to be necessary, the provider can submit the operative report with the claim for payment consideration. On or about May 17, 2023, Anthem OH approved authorization of laminotomy/decompression portion of the procedure (CPT Codes 69030, 63035, 63047, and 63048).

53.    At the time services were rendered, Greenview timely requested inpatient authorization. Anthem OH denied the request for authorization at inpatient level of care for a purported lack of medical necessity based on the services provided purportedly being investigational. On June 11, 2019, Anthem OH approved outpatient services with observation for Patient 2. Via correspondence dated June 14, 2019, Anthem OH denied the 5 requested days of acute inpatient level of care. Then, on June 17, 2019, Greenview was informed by an Anthem OH representative that inpatient admission was denied due to being investigational services that were not medically necessary. Greenview requested a peer-to-peer review on June 17, 2019. By June 28, 2019, Greenview had not received a response about the peer-to-peer review request.

54.    On June 28, 2019, Greenview timely submitted its claim for the medically necessary services provided to Patient 2 to Anthem KY for forwarding to Anthem OH. Per correspondence dated July 10, 2019, Anthem OH was unable to process the claim submitted due to incorrect information on the claim form and requested that Greenview submit a corrected claim. Then on July 15, 2019, and July 22, 2019, Greenview received correspondence stating that Anthem OH had denied the claim in full because additional information had been requested which was needed to adjust the claim. Greenview submitted a corrected inpatient claim on July 31, 2019.

However, via correspondence dated August 23, 2019, Anthem OH denied the claim due to a purported lack of medical necessity.

55. On September 6, 2019, Greenview timely submitted its first-level appeal to Anthem KY for forwarding to Anthem OH, enclosed Patient 2's medical records, and requested a medical necessity review. On September 25, 2019, Greenview contacted Anthem KY and was informed by a representative that it had not received the appeal. On October 1, 2019, Greenview resubmitted its first-level appeal. On November 12, 2019, Greenview was informed by an Anthem KY representative, who confirmed receipt of the appeal as of October 31, 2019, that the appeal had been sent to Anthem OH for review on November 6, 2019. The representative also advised Greenview to allow more time for review.

56. Per correspondence dated November 7, 2019, Anthem OH requested additional information to process the appeal. Then on November 26, 2019, correspondence from Anthem OH stated that it was unable to process the appeal without a business agreement included. On December 6, 2019, a representative of Anthem KY informed Greenview that a letter dated December 3, 2019, had been sent to Greenview stating Anthem OH could not review the appeal because a third party requested the appeal on behalf of the provider, and in order to review it, the appeal had to include a copy of the provider/third party business agreement.

57. On December 19, 2019, Greenview submitted an additional appeal to Anthem KY for forwarding to Anthem OH, enclosed Patient 2's medical records, and requested a medical necessity review. On January 16, 2020, Greenview was informed by a representative from Anthem KY that Anthem OH did not require another appeal, but rather, a resubmission of the first-level appeal with the requested documents attached. As such, Greenview submitted its second-level appeal via mail on January 17, 2020, to Anthem KY for forwarding to Anthem OH, enclosed with

a copy of the business agreement between Greenview and the third party who requested the appeal on Greenview's behalf. However, on February 27, 2020, Greenview inquired as to the status of the appeal and was informed by an Anthem KY representative that Anthem OH denied the appeal for medical necessity and that all levels of appeals had been exhausted.

58.     The denial of Greenview's claim for the medically necessary, covered services rendered to Patient 2 for a purported lack of medical necessity and/or on the basis that they were allegedly investigational constituted a wrongful denial of benefits and should be reversed.

59.     First, Greenview timely notified and requested authorization from Anthem OH for Patient 2's procedure pre-operatively and for Patient 2's inpatient admission. Anthem OH authorized the inpatient admission for four days. As such, Anthem OH is prohibited by Ohio law from denying payment for Greenview's medically necessary services under these circumstances. Ohio Rev. Code Ann. § 3923.041(C)(9)(a)-(b).

60.     Second, the services rendered were medically necessary as evidenced by Patient 2's medical records. The fact that InterQual criteria[19] was met corroborates the medical necessity of the inpatient admission. Patient 2 was admitted as an inpatient by a physician in the exercise of their professional medical judgment. Greenview continued to provide medically necessary services and evaluate Patient 2 while also diligently working to obtain placement and authorization for discharge to a lower setting of acuity. As a result of Anthem OH's actions, or inactions, Patient 2 could not be discharged until authorization was approved, at which time Patient 2 was discharged that same day to a rehabilitation facility.

---

[19] InterQual criteria are guidelines used by health plans and healthcare providers as a tool to evaluate the appropriate level of care (inpatient, observation, or outpatient) for hospitalized patients. The guidelines are not determinative of medical necessity and are not a substitute for the professional medical judgment of a treating physician.

61.     In sum, Greenview provided medically necessary, covered services to Patient 2 and is entitled to payment in full for those services. According to the terms of the Anthem KY Agreement, Greenview is entitled to be paid $93,205.06 for the medically necessary, covered services it provided to Patient 2.

Patient 3, Admitted and Discharged in 2022

62.     At the time services were rendered, Patient 3 was a 69-year-old female who was admitted to Los Robles' emergency department after a motor vehicle collision. She reported head impact without loss of consciousness and pain in her forearm, ankle, and knees. Examination and extensive imaging revealed a large facial laceration, multiple orthopedic injuries including fractures to the left ankle, bilateral femoral, left forearm, proximal ulna, ulna and radial shaft, and right tibia, as well as a spleen hematoma and grade 5 facial nerve injury. While in the emergency department, Patient 3 became hypotensive, requiring fluid resuscitation and a blood transfusion. Patient 3 underwent both plastic surgery and orthopedic surgery for facial laceration repair, fracture reductions, external fixation to both knees, debridement, and splinting. Post-operatively, Patient 3 was admitted to the ICU where she remained intubated.

63.     During her admission, Patient 3 underwent seven additional surgeries, including fixation of fractures to the left distal femur, left radial/ulnar, and left olecranon; left subtalar dislocation repair; and right distal femur fixation. She experienced respiratory arrest on inpatient admission day 18 which required re-intubation and bronchoscopy due to an obstructing mucus plug. An inferior vena cava filter was placed the following day for prevention of deep vein thrombosis, and Patient 3 later underwent tracheostomy and gastrostomy tube placement. Further procedures included removal of the left knee fixator, additional fracture repairs, and subtalar and talonavicular fusion.

64.     Patient 3's admission was further complicated by agitated delirium and cholestatic liver injury. Towards the end of her admission, she received broad-spectrum antibiotics, was extubated, and due to her orthopedic injuries and surgeries, was ordered to be non-weight bearing for at least six weeks. Patient 3's physician ordered that she be placed at a skilled nursing facility, and once the accepting skilled nursing facility received authorization from Patient 3's insurance. The skilled nursing facility received authorization from the insurer on day 54 of her inpatient admission and she was transferred to that skilled nursing facility on the same day.

65.     At the time of admission, Patient 3 presented to Los Robles with insurance through Anthem OH. During Patient 3's inpatient admission, Los Robles continuously submitted her updated clinical and medical records to Anthem OH. Per correspondence dated March 17, 2022, Anthem OH approved a total of 53 days of inpatient admission under authorization number UM26183860. Then, via correspondence dated March 18, 2022, Anthem OH denied one day, the day prior to discharge from Los Robles to the skilled nursing facility, for lack of medical necessity.

66.     On March 25, 2022, Los Robles timely submitted a claim for the medically necessary services rendered to Patient 3 to Anthem CA for forwarding to Anthem OH. By correspondence dated April 5, 2022, Anthem OH denied the claim in full for a purported lack of authorization. Los Robles submitted a corrected claim on April 6, 2022. By correspondence dated April 12, 2022, however, Anthem OH denied the corrected claim in full for a lack of authorization.

67.     On April 12, 2022, Los Robles called Anthem CA and informed an Anthem CA representative that the denied claim had previously been authorized for 53 days. The representative agreed, informed Los Robles that the claim would be reprocessed, and stated that Los Robles should allow 30 days for review.

68.     On or about April 20, 2022, Los Robles escalated its claim with Anthem as an appeal due to erroneous denial reason. By correspondence dated April 26, 2022, Anthem OH again denied Los Robles' claim in full because it was identified as a duplicate claim. On May 3, 2022, Los Robles spoke with an Anthem CA representative who requested Los Robles submit an itemized bill, and Los Robles informed the representative that it had received another denial due to an identified duplicate claim. Later on May 3, 2022, Los Robles spoke with another representative of Anthem CA who confirmed that the claim had been sent for reprocessing on April 12, 2022, and stated that Los Robles should allow additional time for review. By correspondence dated May 10, 2022, Anthem OH again denied the claim erroneously for lack of authorization. When Los Robles called to speak with an Anthem CA representative later that day, the representative clarified that the claim was received on April 12, 2022, but was still being reprocessed because it had been escalated as an appeal on April 28, 2022.

69.     On June 1, 2022, an Anthem CA representative informed Los Robles that the claim had been processed and was pending payment. On June 8, 2022, an Anthem CA representative confirmed the claim had been processed but to allow more time for payment.

70.     By correspondence dated June 13, 2022, Anthem OH issued partial payment to Los Robles for the 53 approved days but upheld the denial of the final day of Patient 3's inpatient admission for lack of authorization.

71.     On or about July 11, 2022, Los Robles timely submitted its second-level appeal to Anthem CA for forwarding to Anthem OH, enclosed Patient 3's medical records, and requested a medical necessity review. On September 12, 2022, Los Robles spoke with an Anthem CA representative who confirmed receipt of the appeal. On October 18, 2022, Los Robles was informed by an Anthem CA representative that Anthem OH upheld the partial denial on appeal.

72.     The partial denial of Los Robles' claim for the medically necessary services provided to Patient 3 for a purported lack of authorization constituted a wrongful denial of benefits and should be reversed.

73.     First, under the Anthem CA Agreement, Anthem OH is prohibited from reducing or denying payment for claims submitted by Los Robles based on discharge delays that are caused by Anthem OH's failure to timely provide authorization. Patient 3 could not be safely discharged from Los Robles until her placement at a skilled nursing facility was authorized by Anthem OH. Los Robles made diligent efforts to discharge Patient 3 to a skilled nursing facility as soon as she was medically stable, but, by no fault of Los Robles, Anthem OH did not authorize Patient 3's placement until day 55 of her inpatient admission, and Patient 3 was discharged the same day. The Hospital did not bill for and is not seeking payment for day 55 (the date of discharge), but Hospital is seeking payment for day 54, which was incurred due to Anthem OH's delay in authorizing placement at the skilled nursing facility.

74.     Second, there is no indication that Anthem OH performed a medical necessity review on appeal, as provided for in the Anthem CA Agreement, despite Los Robles' request for the same. Further, the services rendered were medically necessary as evidenced by Patient 3's medical records. Patient 3 was admitted as an inpatient by a physician in the exercise of their professional medical judgment. Los Robles worked diligently to make the appropriate arrangements for post-hospital care prior to discharge for Patient 3 who had an increased likelihood of adverse health consequences upon discharge if there was no adequate discharge plan in place. Once the skilled nursing facility secured the authorization necessary from Anthem OH, Patient 3 was timely discharged to a safe environment in compliance with California law. *See* Cal. Health & Safety Code § 1262.5(a)-(b).

75. In sum, Los Robles provided medically necessary, covered services to Patient 3 and is entitled to payment in full for those services. According to the terms of the Anthem CA Agreement, Los Robles is entitled to be paid an additional $27,950.00 for the medically necessary, covered services it provided to Patient 3.

<u>Patient 4, Admitted and Discharged in 2023</u>

76. At the time services were rendered, Patient 4 was a 70-year-old female with a history of chronic obstructive pulmonary disease and a recent history of hospital admission for pneumonia and sepsis caused by pneumonia. Approximately two weeks after her prior pneumonia had been treated and she was discharged from the hospital, Patient 4 presented to the emergency department at Los Robles and was placed in observation status for suspected sepsis secondary to infection and was administered oxygen, IV fluids, IV antibiotics, and Zofran. The following day, Patient 4 was admitted as an inpatient per physician order with complaints of ongoing nausea and a non-productive cough.

77. During her admission, a comparison between imaging from a prior hospital admission and new imaging showed a progression of lung nodules with associated infiltrate. A lung biopsy, which was complicated by a pneumothorax that required chest tube placement, revealed metastatic adenocarcinoma of the lung. Due to poor overall nutritional status, a nasogastric tube was placed for feeding and IV total parenteral nutrition was required. Patient 4 then developed deep vein thrombosis in her bilateral lower extremities and a pulmonary embolus that required surgical intervention. A computed tomography scan of the head showed worsening hydrocephalus which required placement of a ventriculoperitoneal shunt and later required repair and revision after the valve was clogged by debris. Hematology and radiation oncology were consulted, and Patient 4 received radiation therapy.

78. Due to Patient 4's continued decline, however, she and her family decided to pursue hospice care. Accordingly, Los Robles began discharge planning, and Patient 4 was discharged per physician order to a hospice facility for comfort care.

79. Patient 4 presented to Los Robles with insurance through Anthem OH. Los Robles timely notified Anthem OH of Patient 4's inpatient admission and sent her medical records to Anthem OH via fax. Throughout Patient 4's admission, Los Robles continued to provide Anthem OH with updated medical records. Per correspondence dated April 24, 2023, Anthem OH approved a number of services for a 3-month service period under authorization number UM43426766.[20] By correspondence dated April 27, 2023, Anthem OH approved 15 days of inpatient admission. Los Robles continued to provide updated medical records to Anthem OH, and Anthem OH approved all dates of service under authorization number UM42805726.

80. On May 16, 2023, Los Robles timely submitted its claim for the medically necessary services rendered to Patient 4 to Anthem CA for forwarding to Anthem OH. By remittance dated May 17, 2023, Los Robles was informed that Anthem OH denied the claim due to the claim being identified as a "readmission."

81. On May 18, 2023, Los Robles submitted a rebill of its claim with the corrected amount owed to Anthem CA for forwarding to Anthem OH. By correspondence dated May 19, 2023, Anthem OH issued no payment, assigned no patient liability, and denied all charges on grounds that the claim was a "readmission."

---

[20] Anthem OH approved authorization for the following services under authorization number UM43426766: 3-dimensional radiotherapy plan, including dose-volume histograms, Intensity Modulated Radiotherapy Plan with Dose Volume Histograms, Multi-leaf collimator (MLC) device(s) for intensity modulated radiation therapy (IMRT), design and construction per IMRT, Stereotactic body radiation therapy, treatment delivery, per fraction to 1 or more lesions, including image guidance, Stereo radiosurgery (particle beam, gamma ray, or linear accelerator; 1 spinal lesion, Stereotactic body radiation therapy, treatment management, per treatment course, to 1 or more lesions, including image.

82. On July 15, 2023, Los Robles timely submitted its first-level appeal to Anthem CA for forwarding to Anthem OH, enclosed with Patient 4's medical records and requested a medical necessity review. On August 3, 2023, Los Robles inquired as to the status of appeal and received correspondence dated August 11, 2023, indicating that Anthem CA had not received the appeal. Despite Los Robles providing Anthem CA with the tracking number,[21] on August 14, 2023, Anthem CA responded that it could not locate the appeal and requested that Los Robles resubmit it. On September 11, 2023, Los Robles again mailed its first-level appeal to Anthem CA for forwarding to Anthem OH, enclosed Patient 4's medical records, and requested a medical necessity review. On October 2, 2023, when Los Robles inquired about the status of appeal, Anthem CA responded on October 9, 2023, that no appeal had been received and provided a new mailing address for appeals for Anthem OH.

83. On October 13, 2023, Los Robles again mailed its first-level appeal to Anthem OH, enclosed with Patient 4's medical records, and requested a medical necessity review. Los Robles inquired about the status of the appeal on November 2, 2023, and received correspondence dated November 13, 2023, indicating that Anthem OH had received the appeal as of October 25, 2023, and to allow 30-60 days for its review. On November 22, 2023, Los Robles inquired about the status of appeal, and Anthem OH responded via correspondence dated November 28, 2023, again confirming receipt of the appeal as of October 25, 2023, stating that it was still under review, and advising Los Robles to allow 30-60 days for review.

84. By correspondence dated December 4, 2023, Los Robles was informed that Anthem OH issued no payment on the claim, assigned no patient liability, and denied all charges because

---

[21] USPS Tracking Number 92055902185884922027740005 shows an item was delivered to an individual at 8:22 a.m. on July 23, 2023, in Los Angeles, California 90060.

the claim had been identified as a "readmission." By correspondence dated December 21, 2023, Anthem OH verified that the appeal was denied due to a previous DRG Grouper reimbursement that had been issued and considered payment in full. Los Robles spoke with an Anthem CA representative who again confirmed that the denial had been upheld on appeal as of November 29, 2023.

85.    The denial of Los Robles' claim for the medically necessary, covered services provided to Patient 4 for a purportedly impermissible readmission constituted a wrongful denial of benefits and should be reversed.

86.    First, the services rendered to Patient 4 by Los Robles were authorized. Anthem OH is prohibited by Ohio law from denying payment for Los Robles' medically necessary services under these circumstances. *See* Ohio Rev. Code Ann. § 3923.041(C)(9)(a)-(b). Further, under the Anthem CA Agreement, authorized services may not be retroactively denied payment unless the authorization is based upon a material misrepresentation of information or omission about the health condition or cause of the health condition, neither of which is applicable here.

87.    Second, the services rendered were medically necessary as evidenced by Patient 4's medical records. Patient 4 was admitted as an inpatient by a physician in the exercise of their professional medical judgment. Los Robles continued to provide medically necessary services and evaluate Patient 4 until such time that she could be safely discharged without serious risk of injury. In this case, it was determined that treatment of her cancer was not a viable option, and her doctor discharged her to hospice care.

88.    Additionally, at least some portion of the billed services constituted emergency and post-stabilization care services for which Anthem OH is required to pay under state and federal law. *See* 42 C.F.R. § 438.114(b)-(e); Ohio Rev. Code §§ 1753.28(B)-(C); 3923.65(B).

89.     In sum, Los Robles provided medically necessary, covered services to Patient 4 and is entitled to payment in full for those services. According to the Anthem CA Agreement, Los Robles is entitled to be paid $71,651.90 for the medically necessary, covered services rendered to Patient 4.

## CAUSES OF ACTION

### COUNT I – BREACH OF EXPRESS CONTRACT (AGREEMENTS)

90.     Paragraphs 1-89 are incorporated herein by reference.

91.     In the alternative to Counts II and III, and in the alternative, to the extent duplicative, to Counts IV-VI, Plaintiffs assert a claim for breach of the Agreements.

92.     Plaintiffs are parties to the Agreements, which provide the terms and conditions under which Plaintiffs will treat subscribers with BCBS health plans and be reimbursed for that treatment.

93.     Anthem OH is bound by the payment terms and conditions of the Agreements for three reasons: (i) as an "Affiliate" of BCBSA and the "Plan" responsible for payment under the Agreements; (ii) as an "Other Payor" under the Anthem CA Agreement; and (iii) by reason of its participation in the BlueCard Program, through which, upon information and belief, it enters into contracts with the Local Plans or the BCBSA, which should be construed as one contract with Plaintiffs' Agreements with the Local Plans.

94.     With respect to claims processed by the Local Plans for Anthem OH, under the BlueCard Program, Anthem OH is both an "Affiliate" and "Plan" responsible for payment under the Agreements, as well as an "Other Payor" as defined in the Anthem CA Agreement. Accordingly, and as expressly provided in the Agreements, Anthem OH is bound by the terms of the Agreements, including their payment terms.

95. The Agreements specifically allow "Affiliates" of the BCBSA and particularly, other BCBS "Plans" through the BlueCard Program, access to the benefits of the Agreements (namely, in-network reimbursement rates) as "Affiliates," "Plans," or "Other Payors," and such "Affiliates," "Plans," and "Other Payors" must comply with all terms and provisions of the Agreements.

96. The Agreements specifically require Plaintiffs to provide medical services to subscribers of other BCBS "Plans" through the BlueCard Program, and the Agreements provide that when Plaintiffs provide such services, the Plans are obligated to reimburse Plaintiffs at the rates set forth in the Agreements.

97. Anthem OH, by its conduct in processing the claims, communicating with Plaintiffs regarding such claims, issuing partial payment on some of the claims, and authorizing the care provided for some of the claims, did in fact access and rely upon the Agreements through the BlueCard Program. As an "Affiliate" of the BCBSA which has accessed and relied upon the Agreements, and acted as an assignee of the Agreements, as a "Plan" responsible for payment, Anthem OH is bound by the terms of the Agreements for the services at issue provided by Plaintiffs to the Subscribers.

98. Anthem OH is also an "Other Payor" and "Plan" responsible for payment under the Anthem CA Agreement because Anthem OH accessed the network between Anthem CA and the Hospitals when its Subscribers received medical care at the Hospitals.

99. Under the Agreements, "Affiliates" and "Other Payors" are a "Plan" responsible for reimbursing the Hospitals for services provided to subscribers of the "Plan" at the rates set forth in the Agreements.

100. As an "Affiliate" under the Agreements, and as an "Other Payor" under the Anthem CA Agreement, Anthem OH is a "Plan" responsible for reimbursing the Hospitals for the services provided to Anthem OH's Subscribers. As the "Plan," Anthem OH is obligated to reimburse the Hospitals for the services provided to the Patients under the BlueCard Program at the rates set forth in the Agreements, which Anthem OH has failed to do.

101. Furthermore, Anthem OH's intent to be bound by the terms of the Agreements is demonstrated by the representations made by Anthem OH to its subscribers and to providers. Anthem OH represents that the Hospitals are "in-network" with the Subscriber's health plans through the BlueCard Program. Anthem OH also represents in its Provider Manual that the Home Plan is responsible for adjudicating claims for services provided to subscribers based on the subscribers' benefits and the providers' agreement with the local BCBS plan, which are the Local Plans.

102. Additionally, upon information and belief, the BlueCard program operates by all individual licensees of the BCBSA entering into contracts with one another and/or with the BCBSA that allow licensees, such as Anthem OH, nationwide access to in-network reimbursement rates of affiliated BCBS health plans, such as the Local Plans, for the licensees' members who receive medical services while living or traveling outside of the geographic service area boundaries of the Home Plan that issues the policy. In fact, each licensee must make its in-network rates available to all other BCBS-branded plans. The Host Plan charges the Home Plan an access fee for access to the local rates and an administrative fee for processing claims. In effect, these nation-wide contracts provide a means by which individual licensees of the BCBSA, such as the Local Plans, assign their rights and locally negotiated payment rates under contracts with health care providers, such as Plaintiffs, to other licensees of the BCBSA, such as Anthem OH, thus allowing

those licensees access to in-network rates, including the substantial discounts off of billed charges built into such rates, under those contracts. The assigning BCBSA licensee(s), which in this case are the Local Plans, then act as the claims administrators and forward the claims to the Home Plan, which in this case is Anthem OH, for final determination and payment, for which the Home Plan is also obligated.

103.    Under this arrangement, the BlueCard Program is essentially a rental network.

104.    Accordingly, Plaintiffs contract with the Local Plans, and the Local Plans contract with Anthem OH (directly or indirectly through BCBSA) to grant Anthem OH access to the negotiated rates and terms between Plaintiffs and the Local Plans as set forth in their Agreements, which is evidenced by the fact that Anthem OH is expressly listed as an "Affiliate" to the Agreements.

105.    When there are multiple contracts between multiple parties in the rental network context, the agreements may be construed as one contract between the multiple parties.

106.    In this case, the Agreements between the Hospitals and the Local Plans and any agreements between the Local Plans and Anthem OH, whether direct or indirect through the BCBSA, should be construed as one contract, such that Anthem OH is bound by the terms of the Local Plans' Agreements with the Hospitals.

107.    Anthem OH knew that by participating in the BlueCard Program with the Local Plans that it would be bound by the terms of the Local Plans' contracts with their local providers, like the Hospitals, which is evidenced by the Agreements' express references to "Affiliates," "Plans," and "Other Payors" being bound by the terms of the Agreements.

108.     Accordingly, there was a meeting of the minds between Plaintiffs and Anthem OH as to the binding nature of the Agreements, as well as the material terms of the Agreements as they relate to both parties.

109.     Under the Agreements, Plaintiffs are entitled to be paid specified rates for the provision of medically necessary, covered services to a subscriber.

110.     Plaintiffs provided medically necessary, covered services to each of the Subscribers pursuant to the Agreements, and those services are payable under the terms of the Agreements.

111.     Anthem OH breached the Agreements by failing to reimburse the Hospitals in full at the rates set forth in the Agreements for the medically necessary, covered services Plaintiffs provided to the Subscribers described above.

112.     Plaintiffs suffered damages as a direct and proximate result of Anthem OH's breach of the Agreements; specifically, Plaintiffs are entitled to be reimbursed in an amount not less than $228,622.96 under the Agreements for the medically necessary, covered services that Plaintiffs provided to Anthem OH's Subscribers.

### COUNT II – BREACH OF IMPLIED-IN-FACT CONTRACT

113.     Paragraphs 1-89 are generally incorporated herein by reference, with exception made for any allegations in this Complaint asserting the existence of a binding express contract between the parties. Any such allegations are not incorporated into this alternative Count II by reference.

114.     In the alternative to Counts I, and III, and in the alternative, to the extent duplicative, to Counts IV-VI, Plaintiffs assert a claim for breach of implied-in-fact contract.

115.     If Anthem OH is not bound by the terms of the Agreements as an "Affiliate," the "Plan" responsible for payment, or an "Other Payor", Plaintiffs are entitled to be reimbursed for

the services provided to the Subscribers pursuant to an implied-in-fact contract existing between Plaintiffs and Anthem OH by reason of Anthem OH's participation in the BlueCard Program.

116.    As participants in the BlueCard Program, Plaintiffs and Anthem OH impliedly agreed and understood that: (i) Plaintiffs would provide services to Anthem OH's subscribers, (ii) Plaintiffs would submit claims to the Local Plans, Anthem OH's agents, for forwarding to Anthem OH for services provided to the subscribers, and (iii) Anthem OH would reimburse Plaintiffs at the rates specified in Plaintiffs' Agreements with the Local Plans.

117.    By participating in the BlueCard Program, Anthem OH, as an "Affiliate" of BCBSA, as the "Plan" responsible for payment of the claims, and as an "Other Payor," was obligated to reimburse Plaintiffs at the rates set forth in the Agreements, even if Anthem OH was not a signatory to the Agreements.

118.    Anthem OH's intent to be bound by an implied-in-fact contract with Plaintiffs is evidenced by Anthem OH's conduct. Anthem OH participated in the adjudication of these claims, communicated with Plaintiffs regarding the claims, authorized the care to be provided in some of the claims, and reviewed and adjudicated appeals.

119.    Anthem OH's intent to be bound by an implied-in-fact contract with Plaintiffs is also demonstrated by the representations made by Anthem OH to its subscribers and local providers.  Specifically, Anthem OH represents that the Hospitals are "in-network" with Anthem through the BlueCard Program, meaning it has a contract with Plaintiffs. Further, Anthem also represents in its Provider Manual that the Home Plan is responsible for adjudicating claims for services provided to subscribers based on the subscribers' benefits and the providers' agreement with the local BCBS plan.

120. Accordingly, there was a meeting of the minds between Plaintiffs and Anthem OH as to the binding nature of the implied-in-fact contract, as well as the material terms of the contract as they relate to both parties.

121. Plaintiffs and Anthem OH understood Anthem OH to be bound to reimburse Plaintiffs according to the terms of the Agreements by reason of their participation in the BlueCard Program and by Anthem OH's own conduct and representations.

122. In reliance on the implied-in-fact contract formed between Plaintiffs and Anthem OH by reason of their participation in the BlueCard Program, Plaintiffs provided medical services to Anthem OH's Subscribers with the expectation that Anthem OH would reimburse Plaintiffs for such services according to the terms of the Agreements.

123. As evidence of Anthem OH's understanding that it was obligated to reimburse Plaintiffs for the services provided to the Subscribers according to the terms of the Agreements, Anthem OH made partial payments on some of the claims submitted for the Subscribers.

124. By denying and underpaying claims for services provided by Plaintiffs to Anthem OH's Subscribers, Anthem OH has breached the implied-in-fact contract existing between Plaintiffs and Anthem OH.

125. Plaintiffs have suffered damages as a direct and proximate result of Anthem OH's breach of the implied-in-fact contract; specifically, Plaintiffs are entitled to be reimbursed in an amount not less than $228,622.96 for the medically necessary, covered services Plaintiffs provided to Anthem OH's Subscribers.

### COUNT III – BREACH OF IMPLIED-IN-LAW CONTRACT / QUANTUM MERUIT

126. Paragraphs 1-89 are generally incorporated herein by reference, with exception made for any allegations in this Complaint asserting the existence of a binding express or implied-

in-fact contract between the parties. Any such allegations are not incorporated into this alternative Count III by reference.

127.     In the alternative to Counts I-II, and in the alternative, to the extent duplicative, to counts IV-VI, Plaintiffs assert a claim for breach of implied-in-law contract and/or *quantum meruit*.

128.     If Anthem OH is not bound to reimburse Plaintiffs by an express contract or an implied-in-fact contract, Anthem OH is obligated to reimburse Plaintiffs for the reasonable value of the services provided to the Subscribers pursuant to the doctrine of implied-in-law contract or quantum meruit.

129.     Plaintiffs provided medically necessary care to all of the Subscribers and submitted claims for such care to Anthem OH at discounted rates set forth in the Agreements, which conferred a multitude of distinct benefits on Anthem OH.

130.     First, for some of the Subscribers, Plaintiffs provided emergency and post-stabilization medical services, which Plaintiffs are obligated to provide under federal law, and for which Anthem OH is obligated to pay under state and federal law. *See* Ohio Rev. Code Ann. §§ 1753.28, 3923.65; Cal. Health & Safety Code §§ 1371.4(b); 1317.2a(d); 42 C.F.R. § 438.114.

131.     Plaintiffs entered into an implied-in-law contract with Anthem OH by virtue of its obligations under federal law to provide emergency medical services to the Subscribers.

132.     Anthem OH entered into an implied-in-law contract with Plaintiffs by virtue of its agreement with the Local Plans to be an "Affiliate," the "Plan" responsible for payment, and/or an "Other Payor" under the Agreements.

133. Additionally, Anthem OH entered into an implied-in-law contract with Plaintiffs by virtue of any contract existing between Anthem OH and the BCBSA requiring Anthem OH to participate in the BlueCard Program.

134. Anthem OH has improperly refused to reimburse Plaintiffs for the reasonable value of the services provided by Plaintiffs, resulting in an improper benefit to Anthem OH at Plaintiffs' expense.

135. Second, when Anthem OH accesses the terms of the Agreements between Plaintiffs and the Local Plans, Anthem OH receives the benefit of discounted rates.

136. The claims Plaintiffs submitted to Anthem OH for reimbursement for services provided to Anthem OH's Subscribers were priced at the discounted rates set forth in the Agreements, rather than the out-of-network rates Anthem OH would otherwise be responsible for paying if it did not access Plaintiffs' Agreements with the Local Plans.

137. Anthem OH received the benefit of substantial discounts off billed charges—a benefit which Anthem OH sought out and obtained by agreeing to participate in the BlueCard Program, but for which Anthem OH now refuses to compensate Plaintiffs.

138. This benefit was conferred upon Anthem OH by Plaintiffs because Plaintiffs determine the amount of their billed charges and allowed Anthem OH to access discounted rates.

139. Third, by allowing Anthem OH to access Plaintiffs' Agreements with the Local Plans, Plaintiffs conferred the benefit of an expanded provider network and increased marketability upon Anthem OH.

140. Specifically, Anthem OH advertises on its website that it is in-network with the Hospitals for the Subscribers' health plans. Anthem OH also advertises its participation in the

BlueCard Program on its website and describes it as a program that allows its members to receive "in-network" medical care nationwide.

141.    By participating in the BlueCard Program and by accessing the Agreements, Anthem OH is able to advertise in-network access to services at the Hospitals in Kentucky and California to its members, which undoubtedly constitutes a benefit to Anthem OH.

142.    Additionally, the BCBSA recognizes that the BlueCard Program results in increased subscriber enrollment for BCBSA licensees. Accordingly, each time a provider (here, the Hospitals) agrees to provide "in-network" care to patients who are enrolled in BCBS health plans in other geographic service areas through the BlueCard Program, it enhances the marketability and potential subscriber enrollment of that BCBSA licensee (here, Anthem OH).

143.    This benefit was conferred upon Anthem OH by Plaintiffs because Plaintiffs could have revoked Anthem OH's access to the Hospitals on an in-network basis at any time but allowed Anthem OH's Subscribers to access their services. Likewise, Plaintiffs could choose at any time not to participate in the BlueCard Program.

144.    Fourth, the BCBSA has recognized that the BlueCard Program confers multiple procompetitive benefits on BCBSA licensees, including "(i) access to high-quality insurance products with a local focus, broad provider networks, and competitive premiums; (ii) access to a nationwide patient volume for health care providers; and (iii) 'prompt payments, ease of claims processing[,] and lower administrative costs.'"[22]

145.    Any such procompetitive benefits can only be conferred upon BCBSA licensees, like Anthem OH, if providers, like the Hospitals, agree to participate in the BlueCard Program by providing "in-network" care to patients with health benefits plans in other BCBS service areas. In

---

[22] *See Blue Cross Blue Shield Antitrust*, 308 F. Supp. 3d at 1274.

such cases, as here, the Hospitals essentially confer these benefits upon Anthem OH when the Hospitals "participate" in the BlueCard Program in this way.

146. Anthem OH was aware of the benefits conferred upon it by Plaintiffs, as Anthem OH knew it was participating in the BlueCard Program, accessed the Agreements (and the discounted rates under the Agreements), communicated with Plaintiffs about the claims at issue, made coverage determinations concerning the claims, and made partial payments.

147. Plaintiffs rendered healthcare services to Anthem OH's Subscribers in reliance on Anthem OH's agreement to reimburse Plaintiffs. Plaintiffs are entitled to a reasonable value for the services provided to the Subscribers. It would be unjust to permit Anthem OH to seek out the present arrangement with Plaintiffs and then refuse to reimburse Plaintiffs for the care provided to Anthem OH's Subscribers.

### COUNT IV – PROMISSORY ESTOPPEL

148. Paragraphs 1-89 are incorporated herein by reference.

149. In the alternative, to the extent duplicative, to Counts I, II, III, V, and VI, Plaintiffs assert a claim for promissory estoppel.

150. For at least some of the Subscribers, Anthem OH issued authorizations for the services provided by Plaintiffs.

151. Anthem OH's authorizations constituted clear, unambiguous promises and/or representations of material fact that Anthem would reimburse the Hospital for the services provided to the Subscribers because Anthem OH is prohibited under state law and the Anthem CA Agreement from retroactively denying payment for services that it preauthorized absent a material misrepresentation or omission of information by Plaintiffs, which did not occur with respect to any of the claims submitted for the Subscribers.

152. Accordingly, Plaintiffs relied on Anthem OH's authorizations as guarantees that Anthem OH would not retroactively deny payment for the services provided to the Subscribers.

153. Plaintiffs' reliance on Anthem OH's authorizations was justifiable, reasonable, and foreseeable because Anthem OH is prohibited under state law and under the Anthem CA Agreement from retroactively denying payment for services that it preauthorized absent a material misrepresentation or omission of information by Plaintiffs.

154. Anthem OH knew or should have known that it was bound by its authorizations and could not retroactively deny payment for preauthorized services under state law and under the Anthem CA Agreement.

155. Anthem OH intended that Plaintiffs rely on its authorizations and proceed with providing medically necessary care to the Subscribers.

156. Plaintiffs were unable to discover and had no reason to believe that they would not be reimbursed for the authorized services provided to the Subscribers, because Plaintiffs knew that Anthem OH was prohibited from retroactively denying payment for preauthorized services under state law and under the Anthem CA Agreement.

157. By relying to its detriment on Anthem OH's authorizations, Plaintiffs have suffered damages.

### COUNT V – CLAIM FOR BENEFITS AND/OR EQUITABLE RELIEF UNDER ERISA (FOR PLANS SUBJECT TO ERISA)

158. Paragraphs 1-89 are incorporated herein by reference.

159. In the alternative, to the extent duplicative, to Counts I, II, III, IV, and VI, Plaintiffs assert a claim for benefits and/or equitable relief under ERISA.

160. Upon information and belief, some (or all) of the Subscribers whose hospital admissions are at issue are subscriber(s) to an employer-sponsored health benefits plan that

Anthem OH administers or underwrites. ERISA governs such health benefits plans. This is a claim to recover benefits, enforce rights, and clarify rights to benefits as to such healthcare claims for payment related to such plans pursuant to 29 U.S.C. § 1132(a)(1)(B), (3).

161.    Section 502(a)(1)(B) of ERISA allows a participant or beneficiary covered by a welfare benefits plan to sue to "recover benefits due . . . under the terms of his plan, to enforce rights under the terms of the plan, or to clarify . . . rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). Furthermore, Section 502(a)(3) of ERISA allows a participant or beneficiary covered by a welfare benefits plan to sue to "(A) enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." 29 U.S.C. § 1132(a)(3).

162.    Plaintiffs have standing to pursue claims under ERISA as the authorized representative and assignee of benefits for the Subscribers who were members of ERISA plans under 29 U.S.C. § 1132(a)(1)(B). Upon admission to the Hospitals, each patient (or their legal representative) signs a COA, which includes an assignment of the patient's health insurance benefits (including an assignment of rights to pursue those benefits) to Plaintiffs. Furthermore, to the extent any relevant ERISA benefit plan includes an anti-assignment provision, Anthem OH has waived its right to enforce any such anti-assignment provision by failing to raise the provision as a reason for a benefits denial during the administrative process when Anthem OH knew that Plaintiffs were requesting payment pursuant to a clear and unambiguous assignment. Plaintiffs also have Article III standing as an assignee.

163.     Plaintiffs provided medically necessary, covered services to the Subscribers described above, all of whom are Anthem OH's subscribers. Anthem is therefore obligated to provide benefits (i.e., payment) to the Plaintiffs, as assignees, for such care.

164.     Anthem OH breached the terms of the ERISA plans by refusing to pay for covered services as required by those plans. Anthem OH breached the ERISA plans by making claims determinations (i.e., adverse benefits determinations as defined under ERISA) that had no basis in the terms of the plans, without valid evidence or information to substantiate such determinations, and in an unreasonable and arbitrary manner.

165.     Plaintiffs have exhausted administrative remedies under the ERISA plans at issue. For the claims subject to ERISA, Plaintiffs have submitted timely appeals to Anthem OH. Alternatively, to the extent Plaintiffs did not exhaust each level of appeal, Plaintiffs are excused from exhausting administrative remedies completely because Anthem OH failed to follow claims procedures required by ERISA and its implementing regulations. When Plaintiffs appealed each of the wrongful denial of benefits described above, it requested copies of the relevant health plan documents along with a statement of the plan's review procedures and time limits applicable to such review procedures, including any contractual limitations and any plan provisions upon which Anthem OH relied for its denial. Anthem OH did not provide the requested health plan documents, plan provisions, or otherwise advise Plaintiffs of contractual limitations or other relevant provisions from the health plan documents at any point during the claims adjudication or appeals process. *See* 29 C.F.R. § 2560.503-1.

166.     ERISA requires plan administrators to provide adequate notice in writing to plan members of adverse benefit determinations, and to afford members a reasonable opportunity for a full and fair review of their adverse benefit determinations. 29 U.S.C. § 1133. Anthem OH is a

"plan administrator" within the meaning of that term under ERISA. Anthem OH is designated the plan administrator for ERISA plans, or it otherwise acts in the role of plan administrator with the discretion generally afforded to a plan administrator. Thus, Plaintiffs are entitled to the protections of 29 U.S.C. § 1132.

167.    Although Anthem OH was obligated to do so, it failed and refused to provide a "full and fair review" to Plaintiffs, as the assignee of the affected Patients' claims, and otherwise failed to make necessary disclosures to Plaintiffs pursuant to 29 U.S.C. § 1133 and the regulations promulgated under ERISA.

168.    Alternatively, exhaustion of administrative remedies was not required because it was futile under the circumstances. Plaintiffs repeatedly attempted to engage with Anthem OH to challenge its claims adjudication decisions, but Anthem OH has failed and refused to modify its behavior. Any further attempts by Plaintiffs to challenge Anthem OH's behavior as alleged herein would be futile.

169.    Anthem OH's conduct constitutes a breach of its obligations under ERISA and the relevant ERISA plans and an abuse of discretion. Anthem OH has denied Plaintiffs benefits to which they are entitled as assignees.

170.    Anthem OH's failure to pay Plaintiffs what Anthem OH was obligated to pay was, upon information and belief, motivated by Anthem OH's desire to achieve maximum profits, and it has resulted in a direct financial benefit to Anthem OH. Consequently, these actions constitute a conflict of interest and bad faith.

171.    Plaintiffs provided medically necessary, covered services to each Subscriber at issue. Those services qualify as covered services under the Subscribers' health plans, and Anthem OH is therefore obligated to pay Plaintiffs for those services.

172. Anthem OH failed to pay Plaintiffs for the covered services that it provided to the Subscribers. Anthem OH's denial of benefits should be reversed because those determinations were wrong, incorrect, improper, unlawful, unreasonable, not based on any evidence, arbitrary and/or capricious, and constitute an abuse of discretion.

173. As assignees of the benefits to which the affected Subscribers are entitled pursuant to their ERISA plans, Plaintiffs demand recovery of benefits and all other relief available pursuant to 29 U.S.C. § 1132(a)(1)(B), (a)(3).

**COUNT VI - BREACH OF CONTRACT (FOR PLANS NOT SUBJECT TO ERISA)**

174. Paragraphs 1-89 are incorporated herein by reference.

175. In the alternative, to the extent duplicative, to Counts I-V, Plaintiffs assert a claim for breach of the Patient's health insurance contracts that are not subject to ERISA.

176. Plaintiffs provided medically necessary services to each of the Subscribers at issue, and upon information and belief, those services are covered under the terms of each Subscriber's respective health plan. To the extent that any of those health plans are not subject to ERISA, Plaintiffs are entitled to recover payment under the plan under a common law claim for breach of contract.

177. Each health plan is a contract between the Subscriber and Anthem OH, under which Anthem OH agrees to cover medically necessary, covered services that the Subscriber receives. Plaintiffs have standing to sue for breach of contract for Anthem OH's failure to pay for these Subscribers' hospital treatment because each Subscriber assigned their benefits and rights under the health plan to Plaintiffs.

178. Plaintiffs performed their obligations under the Subscribers' health plans by providing medically necessary, covered services to each Subscriber.

179.     Anthem OH breached each of the Subscribers' health plans by failing to issue payment to Plaintiffs at the rates set forth in the Agreements for the medically necessary, covered services that Plaintiffs provided.

180.     Plaintiffs suffered damages due to Anthem OH's breach of each Subscriber's health plan.

### CONDITIONS PRECEDENT

164.     All conditions precedent have been performed or have occurred.

### JURY DEMAND

Plaintiffs hereby demand a trial by jury for all claims so triable.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, West Hills Hospital; Los Robles Regional Medical Center d/b/a Los Robles Hospital and Medical Center; and Greenview Hospital, Inc. d/b/a TriStar Greenview Regional Hospital hereby request that Defendant, Community Insurance Company d/b/a Anthem Blue Cross and Blue Shield, be cited to appear and answer this Complaint, and that upon final trial and determination thereof, that judgment be entered in favor of Plaintiffs, awarding them the following relief:

A.     A judgment on Count I against Anthem OH awarding Plaintiffs damages for breach of the Agreements;

B.     A judgment on Count II against Anthem OH awarding Plaintiffs damages for breach of implied-in-fact contract;

C.     A judgment on count III against Anthem OH awarding Plaintiffs damages for breach of implied-in-law contract and/or *quantum meruit* in the form of the reasonable value of the services provided to the Patients;

D.     A judgment on Count IV against Anthem OH awarding Plaintiffs damages for promissory estoppel;

E.     A judgment on Count V against Anthem OH awarding Plaintiffs benefits and all other relief available pursuant to 29 U.S.C. § 1132(a)(1)(B) and (a)(3) related to Anthem

OH's violation of ERISA as to any services provided to a Patient alleged herein that has a health benefits plan governed by ERISA;

F.     An award of Plaintiffs' reasonable attorney's fees and costs, including, but not limited to, pursuant to 29 U.S.C. § 1132(g);

G.     A judgment on Count VI against Anthem OH awarding Plaintiffs damages for breach of any Patients' health insurance contract that is not governed by ERISA; and/or

H.     Such other and further relief to which Plaintiffs may be entitled.

Dated this the <u>22nd</u> day of August, 2025.

Respectfully submitted,

**POLSINELLI PC**

<u>/s/ Hyun (Eric) Yoon</u>
Hyun (Eric) Yoon (OH Bar No. 91244)
Three Logan Square
1717 Arch Street, Suite 2800
Philadelphia, PA 19103
Phone: 215-267-3001
Fax: 215-267-3002
eyoon@polsinelli.com

Joshua D. Arters (*pro hac vice forthcoming*)
Tennessee Bar No. 031340
501 Commerce Street, Suite 1300
Nashville, TN 37203
Phone: 615-252-3923
Fax: 615-259-1510
jarters@polsinelli.com

*Counsel for Plaintiffs West Hills Hospital; Los Robles Regional Medical Center d/b/a Los Robles Hospital and Medical Center; and Greenview Hospital, Inc. d/b/a Greenview Regional Hospital*